**UNITED STATES DISTRICT COURT**

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| THOMAS RUSSELL HENRY,<br><br>Plaintiff,<br><br>v.<br><br>CAROLYN W. COLVIN, Acting Commissioner of Social Security,<br><br>Defendant. | Case No. 1:13-cv-00830-SMS<br><br>ORDER AFFIRMING COMMISSIONER'S DENIAL OF BENEFITS AND ORDERING JUDGMENT FOR COMMISSIONER<br><br>Doc. 13 |

Plaintiff Thomas Russell Henry, by his attorney, Ann M. Cerney, seeks judicial review of a final decision of the Commissioner of Social Security ("Commissioner") denying his application for disability insurance benefits pursuant to Title II of the Social Security Act (42 U.S.C. § 301 *et seq.*) (the "Act"). Having reviewed the record as a whole in light of applicable law, the Court finds that the hearing decision was supported by substantial evidence. Accordingly, the Court affirms the denial of disability benefits.

I.  **Procedural History**

On April 2, 2010, Plaintiff applied for disability insurance benefits, alleging disability beginning May 9, 2003. The Commissioner initially denied the claim on October 22, 2010, and upon reconsideration, on December 29, 2010. On January 5, 2010, Plaintiff filed a timely request for a hearing.

Plaintiff appeared and testified at a hearing on August 15, 2011, at which time he amended his alleged onset date to August 5, 2008. On September 9, 2011, Administrative Law Judge Daniel

1

G. Heely denied Plaintiff's application. The Appeals Council denied review on April 4, 2013. Plaintiff filed the complaint in this action on May 30, 2013.

## II.   Administrative Record

**Plaintiff's testimony.** Plaintiff (born October 9, 1949) completed high school and three or four junior college classes. Except for three years in which he served as an Army medic, he worked as a self-employed roofing contractor until he was injured on the job on May 1, 2003. From October 2007 to May 2009, he was employed as a roofing inspector and a metallurgical technician.

Plaintiff lives with his wife, who has epilepsy and does not work outside their home. They have no children.

Plaintiff described himself as "not real hardcore of a house cleaner." AR 33. He sweeps a little, cleans up after the dogs, and occasionally gives them food or water.

Plaintiff drives wherever he or his wife need to go. Until they sold their San Francisco home in 2010, Plaintiff drove down monthly to visit family, pick up mail, and attend to things. He generally stopped for breaks twice when driving from Copperopolis to San Francisco.

Plaintiff's arthritis made it difficult for him to sit in a chair for very long. Conforming his spine to the chair was difficult and painful. Recently, he has begun sitting on the ground, which is more comfortable.

Plaintiff enjoyed walking but finds it becoming difficult as his arthritis worsens and he begins to "lock up." AR 34. On good days, he could still walk for 20 to 25 minutes without rest; on bad days, he could barely walk a block.

Plaintiff enjoyed shooting rifles on a range, fishing, and boating. Plaintiff had to switch to a smaller rifle (22's) as shooting big rifles (30-6 and 30-30) became painful. He corrected the consulting physician's report, explaining that he had never snowboarded. Although he lives next to Lake Tulloch, he had only taken his boat out three times in the past year to entertain houseguests.

Plaintiff's former employer initially hired him to work as a roofing inspector on large jobs, an occupation he loved. When no inspection jobs were available, his employer assigned him to work in a metallurgy lab, even though he was not certified. From January 1 through August 5, 2008,

1  Plaintiff worked performing metallurgical testing.  The job required him to lift large objects
2  weighing over 100 pounds.  He earned $27.50 per hour.  He was not trained as a metallurgist, but
3  simply performed tests according to instructions and recorded the results.

4  On August 5, 2008, Plaintiff suffered a heart attack.  As a result, he underwent a five-way
5  heart bypass.

6  Plaintiff returned to work on or about November 17, 2008.  His employer, who was a friend,
7  attempted to provide easy work performing micro hardness testing on bolts used on various
8  construction projects.  Testing bolts required Plaintiff to lift only ten-to-twenty-pound containers of
9  bolts.  His employer also provided accommodations such as allowing Plaintiff to stop work as
10 needed.  Although Plaintiff hoped to work 40 hours weekly, he was not always able to do that.  In
11 addition, as his employer completed its pending hospital construction jobs, the amount of available
12 work testing lightweight objects diminished.  Plaintiff was laid off for several weeks in March 2009
13 and then laid off permanently in May 2009.  Plaintiff believed he would have been let go earlier but
14 for his friendship with his employer.

15 Thereafter, Plaintiff received unemployment benefits and attempted to secure another job
16 through CalWorks.  He received no job offers.

17 Plaintiff stopped using cigarettes and alcohol in 1975.  He used medical marijuana with the
18 approval of his primary care physician.  He took his prescriptions as prescribed, although he used the
19 prescribed Vicodin and cyclobenzaprine (a relaxant for muscle spasms and associated pain) as little
20 as possible to avoid side effects, such as grogginess and constipation.  When he did not take those
21 painkillers, he experienced pain.  He did not take aspirin for pain relief since he took low-dose
22 aspirin as part of the treatment for his cardiac conditions.  He had applied for, but had not yet
23 received, a disability rating from the Veterans Administration.

24 **Exertion Questionnaire.**  In an exertion questionnaire dated June 17, 2010, Plaintiff
25 explained that upon heavy exertion, his spine stiffened, and he experienced excruciating pain.
26 Although he could manage lifting and carrying up to fifteen pounds, lifting more than twenty-five
27 pounds more than a few times resulted in deep aching.  His medications included Carvedilol (heart),
28

1  Simvastin (heart), Slo Niacin (heart), low-dose aspirin, hydrocodone-acetaminophen, and
2  cyclobenzaprine.
3        Plaintiff attempted to walk a mile daily following his heart bypass surgery.  His hip and
4  shoulder pain increased as the day progressed so that by the end of the day, he could no longer
5  straighten up, but leaned forward.  He also tried to climb stairs but was easily winded and his hips
6  "locked up."  AR 220.
7        Plaintiff shopped as requested by his wife.  He helped her carry heavy purchases.  He cleaned
8  floors, vacuumed, washed windows, trimmed trees, cleaned the yard, and maintained the house.  "I
9  can do most of those things if I am careful not to strain myself and move slowly," he said.  AR 220.
10       Plaintiff was also able to do basic maintenance on his car and replace small parts but could
11 not lift larger parts.  He could garden and could trim trees and weeds.  He could no longer use a post
12 hole digger or rototiller.  He remained cautious of overexertion following his heart surgery.
13       In summary, Plaintiff explained that he had severe back, neck, shoulder, and hip pain, and
14 often could not stand up on the first try.  His condition affected every activity, requiring him to move
15 slowly and carefully to avoid strain.  Although he pushed himself to work through his pain, he had to
16 stop working completely if he strained his back.
17       Plaintiff could drive ten to twenty miles without problem.  At longer distances, 50 to 125
18 miles, he had difficulty getting out of the car.  Although he would regain the ability to move about
19 later, pain in the small of his back would remain.
20       **Disability report (November 16, 2010).**  Plaintiff reported that his arthritis had worsened,
21 and he could no longer move his hips to walk.  He was experiencing painful chest pains more
22 regularly.  In October 2010, Plaintiff transferred his care from Kaiser Permanente to the Veterans'
23 Administration.  His medications included Carvedilol, Flexeral, Niacin, Nitroglycerine, Simvastin,
24 and Vicodin.
25       **Disability report (January 5, 2011).**  Plaintiff reported increased arthritis pain, chest pain,
26 and fatigue.
27 ///
28

**Medical Records.** Plaintiff reported few health problems until January 2004 when he received multiple electric shocks to his left chest and shoulder while roofing. Doctors ruled out myocardial infarction based on enzyme tests.

When Plaintiff sought care at the San Francisco Veterans' Administration Medical Center in 2004, he had not seen a doctor in eleven years. Plaintiff reported that he had been treated for chest pain in 1993 and had experienced a stress test but was told that the pain related to gastric esophageal reflux disease (GERD).

In February 2004, Plaintiff, who was experiencing chest pain, was referred to the cardiology department for an ECG. In April 2004, provider Jennie Orland diagnosed myocardial degeneration (cardiomyopathy) and dyspepsia. A stress test revealed that Plaintiff's left ventricular cavity was dilated with depressed ejection fraction estimated to be 36 percent at stress and 29 percent at rest.

On June 29, 2004, provider Kristin Weaver diagnosed hyperlipedemia. On July 14, 2004, provider Maria Kerbleski diagnosed chronic hepatitis C. (In 2005, after repeatedly cancelling liver clinic appointments, Plaintiff advised the VA that he was not pursuing further diagnostic services relating to Hepatitis C since he was feeling fine.[1]) In 2005, Plaintiff transferred primary care to Kaiser-Permanente.

On August 5, 2008, after co-workers urged him to seek medical care because he "didn't look good," Plaintiff went to the emergency room, complaining of chest pain that he attributed to previously diagnosed GERD. In fact, Plaintiff had a heart attack, as confirmed by an abnormal EKG and the positive results of blood testing for markers. As a result, Plaintiff had quintuple heart by-pass surgery.

At a follow-up exam on September 19, 2008, Plaintiff reported intermittent chest discomfort. He had experienced severe heartburn, with some nausea, after eating oatmeal and taking a walk. A follow-up ultrasound on September 24, 2008 revealed mild atherosclerotic changes and no significant stenosis or hemodynamic changes.

///

---

[1] Plaintiff's VA medical records acknowledged Plaintiff's discomfort with the Hepatitis C diagnosis and noted that Hepatitis C infection is common among former Vietnam War-era medics, since they were frequently exposed to blood without protective barrier devices commonly used today.

5

On February 1, 2010, Raymond Wong King, M.D., conducted a follow-up exam. Dr. King noted that Coreg had improved Plaintiff's left ejection fraction (heart failure) and that medication should be titrated to an optimal dose. Since Plaintiff's cholesterol levels had not reached goal, the doctor switched Plaintiff's medication to Zocor 80.

On March 9, 2010, Plaintiff saw Nurse Arcelia Corrales, M.A., for moderately severe low back pain of three days' duration that increased with walking and standing. She referred Plaintiff to Ho Quang Bui, M.D., who treated Plaintiff with injections of Dilaudid (hydriomorphone) and Benadryl, and prescribed Dilaudid and Cyclobenzaprine.

Blood testing conducted by Kaiser Permanente on April 16, 2010, again revealed Hepatitis C antibodies. A sonogram conducted on August 27, 2010, revealed no liver abnormalities.

On August 10, 2010, Umer Malik, M.D., an internal medicine resident, provided a consultative report following an examination of Plaintiff. Dr. Malik reviewed no other medical records. Dr. Malik observed that Plaintiff was able to sit comfortably and to walk and get on and off the examination table without difficulty. The doctor concluded that Plaintiff did not then have any joint inflammation or congestive heart failure. Dr. Malik opined that although Plaintiff would experience limitations for 12 continuous months, he could sit, stand, and walk up to six hours, and lift 20 pounds occasionally and ten pounds frequently. Plaintiff had no postural or manipulative limitations and did not require an assistive device. Plaintiff should not work at heights or around heavy machinery.

At the hearing, Plaintiff's attorney lodged an objection as to the weight to be given to Dr. Malik's opinion since Dr. Malik had not been given access to Plaintiff's medical records, including multiple x-rays documenting more severe arthritis that Dr. Malik acknowledged. The ALJ overruled the objection stating, "I will decide what weight to give all the evidence and all the documents are now received into evidence." AR 21. Plaintiff corrected Dr. Malik's report of his activities, testifying that he had never snowboarded, an activity that Dr. Malik reported Plaintiff enjoyed.

On August 23, 2010, Dr. Ho Quang conducted a follow-up examination of Plaintiff. Diagnoses included history of aorto-coronary bypass, ischemic heart disease, ischemic

cardiomyopathy, hyperlipedemia, and left-side heart failure with an ejection fraction of 31-40 percent. Dr. Ho Quang recommended a low salt, low fat diet and regular exercise.

On September 30, 2010, radiologist Clifton Choo evaluated cervical spine x-rays. He identified 1-2 mm. retrolisthesis of C4 on C5, C5 on C8, and C6 on C7, and moderately severe cervical spondylosis at C3-C4, C4-C5, C5-C6, and C6-C7.

On October 14, 2010, W. Jackson, M.D., prepared a physical residual capacity assessment for the agency. Dr. Jackson opined that Plaintiff retained the ability to lift and carry 20 pounds occasionally and ten pounds frequently, and to sit, stand, and walk six hours in an eight-hour work day. Dr. Jackson rejected Dr. Malik's environmental restrictions.

On November 5, 2010, noting Plaintiff's cardiac disease diagnosis, 5-vessel bypass surgery, and current intermittent chest pain, doctors at the VA center conducted myocardial perfusion imaging of Plaintiff with exercise stress. Although the test showed no evidence of stress-induced ischemia, since Plaintiff was only able to achieve 78 percent of the maximum predicted heart rate through exercise, the doctors noted that the test might underestimate the extent of stress-induced perfusion abnormalities. Accordingly, the doctors recommended a second test using pharmocologic stress. The left ventricular ejection fraction (LVEF) was 40 percent post-stress. The test revealed no evidence of transient ischemic dilation (TID). Evaluating the test on November 8, 2010, John R. Teerlink, M.D. noted that because the test was terminated as a result of arthritis pain in Plaintiff's ankle before Plaintiff reached the required level of 85 percent of maximum predicted heart rate, the results could not be interpreted.

Electrocardiograms administered on October 28, and November 5, 2010, were abnormal. VA physicians were able to compare the results to electrocardiograms administered in 2004 and to each other to identify changing heart rhythms.

On April 25, 2010, radiologist Stefanie Weinstein, M.D., evaluated hip and pelvis x-rays. She diagnosed:

> There are mild to moderate degenerative changes involving both hip joints with subchondral acetabular sclerosis and femoral head spurring. No evidence of fracture or avascular necrosis. SI joints are intact. 9 mm well-defined sclerotic

7

> focus within the right proximal femur likely to represent a bone island. No associated cortical destruction.

AR 419.

Dr. Weinstein also reviewed four x-rays of Plaintiff's lumbar sacral spine, identifying:

> Severe multilevel degenerative disc disease. There is 9 mm of retrolisthesis of L-2 relative to L3 with severe disc space narrowing at L1-L2 and L2-L3 and L3-L4. Additionally, there is prominent facet hypertrophy and degenerative change in the inferior lumbar spine. The aorta is calcified.

AR 420.

On May 4, 2011, provider Jennie Orland referred Plaintiff to the Cardiology Clinic for a congestive cardiomyopathy consult. Orland noted that Plaintiff's left ejection fraction was 36 percent and 29 percent with stress.

**Vocational expert.** Stephen Schmidt testified as vocational expert. He categorized Plaintiff's former work as contractor (182.166-010, SVP 7), categorized as light work but performed by Plaintiff as medium; metallurgical technician (011.261-010), categorized as light and SVP 6, but actually performed as heavy and SVP 3. Plaintiff's transferable skills included knowing roofing, roofing materials, roofing processes, and roofing inspection; running crews and jobs; estimating; buying materials; and inspecting metals for structural qualities, hardness, and strength.

For each hypothetical question, the ALJ directed Schmidt to assume an individual with the same age, education, work history, and transferable skills as Plaintiff. For the first hypothetical question, the ALJ directed Schmidt to assume that the hypothetical individual could sit six hours, but stand and walk less than two hours in a normal workday; could lift or carry less than ten pounds, even occasionally; could never climb, balance, stoop, kneel, crouch, crawl, or work around hazards; and would need numerous unscheduled rest breaks. Schmidt opined that no job would be available for such an individual.

For the second hypothetical question, the ALJ directed Schmidt to assume that the hypothetical individual could sit, stand, and walk six hours of eight each with normal breaks, and lift or carry 20 pounds occasionally and ten pounds frequently. Schmidt opined that Plaintiff could perform both of his past jobs as these were normally performed in the national economy. Since no

other jobs using Plaintiff's transferable skills existed, the only other available positions would be unskilled positions. These would include cashier (No. 211.562-010, light, SVP 2) with 117,000 jobs available in the California economy, and cleaner (323.687-014, light, SVP 2) with 43,000 jobs available in the California economy.

For the third hypothetical question, Plaintiff's attorney directed Schmidt to assume a hypothetical person of Plaintiff's age (61) with Plaintiff's education (12 years) and work experience, and the ability to perform the full range of light work, except that he would need to avoid heights and heavy machinery. Schmidt opined that such a person would be unable to perform either of Plaintiff's past jobs.

## II. Discussion

### A. Legal Standards

To qualify for benefits, a claimant must establish that he or she is unable to engage in substantial gainful activity because of a medically determinable physical or mental impairment which has lasted or can be expected to last for a continuous period of not less than twelve months. 42 U.S.C. § 1382c (a)(3)(A). A claimant must demonstrate a physical or mental impairment of such severity that he or she is not only unable to do his or her previous work, but cannot, considering age, education, and work experience, engage in any other substantial gainful work existing in the national economy. *Quang Van Han v. Bowen*, 882 F.2d 1453, 1456 (9th Cir. 1989).

To encourage uniformity in decision making, the Commissioner has promulgated regulations prescribing a five-step sequential process for evaluating an alleged disability. 20 C.F.R. §§ 404.1520 (a)-(f); 416.920 (a)-(f). The process requires consideration of the following questions:

Step one: Is the claimant engaging in substantial gainful activity? If so, the claimant is found not disabled. If not, proceed to step two.

Step two: Does the claimant have a "severe" impairment? If so, proceed to step three. If not, then a finding of not disabled is appropriate.

Step three: Does the claimant's impairment or combination of impairments meet or equal an impairment listed in 20 C.F.R., Pt. 404, Subpt. P, App. 1? If so, the claimant is automatically determined disabled. If not, proceed to step four.

9

| | | |
|---|---|---|
| Step four: | Is the claimant capable of performing his past work? If so, the claimant is not disabled. If not, proceed to step five. | |
| Step five: | Does the claimant have the residual functional capacity to perform any other work? If so, the claimant is not disabled. If not, the claimant is disabled. | |

*Lester v. Chater*, 81 F.3d 821, 828 n. 5 (9th Cir. 1995).

The ALJ found that Plaintiff had not engaged in substantial gainful activity since the alleged onset date of August 5, 2008. His severe impairments included bilateral hip arthritis, degenerative disc disease of the cervical and lumbar spine, and coronary artery disease status post coronary artery bypass graft surgery (20 C.F.R. § 404.1520(c)). None of these impairments met or medically equaled any of the impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. §§ 404.1520(d), 404.1525, and 404.1526). Plaintiff was capable of performing a full range of light work as defined in 20 C.F.R. 404.1567(b). Plaintiff could perform his past relevant work as a contractor and metallurgical technician. Accordingly, the ALJ concluded that Plaintiff was not under a disability, as defined by 20 C.F.R. § 404.1520(f).

### B. Scope of Review

Congress has provided a limited scope of judicial review of the Commissioner's decision to deny benefits under the Act. In reviewing findings of fact with respect to such determinations, a court must determine whether substantial evidence supports the Commissioner's decision. 42 U.S.C. § 405(g). Substantial evidence means "more than a mere scintilla" (*Richardson v. Perales*, 402 U.S. 389, 402 (1971)), but less than a preponderance. *Sorenson v. Weinberger*, 514 F.2d 1112, 1119 n. 10 (9th Cir. 1975). It is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson*, 402 U.S. at 401. The record as a whole must be considered, weighing both the evidence that supports and the evidence that detracts from the Commissioner's decision. *Jones v. Heckler*, 760 F.2d 993, 995 (9th Cir. 1985). In weighing the evidence and making findings, the Commissioner must apply the proper legal standards. *See, e.g., Burkhart v. Bowen*, 856

F.2d 1335, 1338 (9th Cir. 1988). This Court must uphold the ALJ's determination that the claimant is not disabled if the ALJ applied the proper legal standards and the ALJ's findings are supported by substantial evidence. *See Sanchez v. Secretary of Health and Human Services*, 812 F.2d 509, 510 (9th Cir. 1987). "Where the evidence as a whole can support either outcome, we may not substitute our judgment for the ALJ's." *Key v. Heckler*, 754 F.2d 1545, 1549 (9th Cir. 1985).

### C. Plaintiff's Credibility

Pointing to specific aspects of the hearing decision (cardiac impairment, daily activities, and musculoskeletal impairment), Plaintiff contends that the ALJ erred in determining that Plaintiff was not fully credible. The Commissioner counters that the ALJ considered four legally valid factors and that substantial evidence supported his findings. The Court agrees with the Commissioner that the ALJ's findings were supported by substantial evidence.

An ALJ is not "required to believe every allegation of disabling pain" or other non-exertional requirement. *Orn v. Astrue*, 495 F.3d 625, 635 (9th Cir. 2007), *quoting Fair v. Bowen*, 885 F.2d 597, 603 (9th Cir. 1989). But if he or she decides to reject a claimant's pain testimony after a medical impairment has been established, the ALJ must make specific findings assessing the credibility of the claimant's subjective complaints. *Ceguerra v. Secretary of Health and Human Services*, 933 F.2d 735, 738 (9th Cir. 1991). *See also Bunnell v. Sullivan*, 947 F.2d 341, 346 (9th Cir. 1991). "[T]he ALJ must identify what testimony is not credible and what evidence undermines the claimant's complaints." *Lester*, 81 F.3d at 834, *quoting Varney v. Secretary of Health and Human Services*, 846 F.2d 581, 584 (9th Cir. 1988). He or she must set forth specific reasons for rejecting the claim, explaining why the testimony is unpersuasive. *Orn*, 495 F.3d at 635. *See also Robbins v. Social Security Administration*, 466 F.3d 880, 885 (9th Cir. 2006). The credibility findings must be "sufficiently specific to permit the court to conclude that the ALJ did not arbitrarily discredit claimant's testimony." *Thomas v. Barnhart*, 278 F.3d 947, 958 (9th Cir. 2002).

11

When weighing a claimant's credibility, the ALJ may consider the claimant's reputation for truthfulness, inconsistencies in claimant's testimony or between her testimony and conduct, claimant's daily activities, claimant's work record, and testimony from physicians and third parties about the nature, severity and effect of claimant's claimed symptoms.  *Light v. Social Security Administration*, 119 F.3d 789, 792 (9th Cir. 1997).  The ALJ may consider "(1) ordinary techniques of credibility evaluation, such as claimant's reputation for lying, prior inconsistent statements concerning the symptoms, and other testimony by the claimant that appears less than candid; (2) unexplained or inadequately explained failure to seek treatment or to follow a prescribed course of treatment; and (3) the claimant's daily activities."  *Tommasetti v. Astrue*, 533 F.3d 1035, 1039 (9th Cir. 2008), *quoting Smolen v. Chater*, 80 F.3d 1273 (9th Cir. 1996).  If the ALJ's finding is supported by substantial evidence, the Court may not second-guess his or her decision.  *Thomas*, 278 F.3d at 959.

The Ninth Circuit has summarized the applicable standard:

> [T]o discredit a claimant's testimony when a medical impairment has been established, the ALJ must provide "'specific cogent reasons for the disbelief.'" *Morgan*, 169 F.3d [595,] 599 [9th Cir. 1999] (quoting *Lester*, 81 F.3d at 834).  The ALJ must "cit[e] the reasons why the [claimant's] testimony is unpersuasive."  *Id.* Where, as here, the ALJ did not find "affirmative evidence" that the claimant was a malingerer, those "reasons for rejecting the claimant's testimony must be clear and convincing."  *Id.*  Social Security Administration rulings specify the proper bases for rejection of a claimant's testimony . . . An ALJ's decision to reject a claimant's testimony cannot be supported by reasons that do not comport with the agency's rules.  *See* 67 Fed.Reg. at 57860 ("Although Social Security Rulings do not have the same force and effect as the statute or regulations, they are binding on all components of the Social Security Administration, . . . and are to be relied upon as precedent in adjudicating cases."); *see Daniels v. Apfel*, 154 F.3d 1129, 1131 (10th Cir. 1998) (concluding the ALJ's decision at step three of the disability determination was contrary to agency rulings and therefore warranted remand). Factors that an ALJ may consider in weighing a claimant's credibility include reputation for truthfulness, inconsistencies in testimony or between testimony and conduct, daily activities, and "unexplained, or inadequately explained, failure to seek treatment or follow a prescribed course of treatment."  *Fair*, 885 F.2d at 603; *see also Thomas*, 278 F.3d at 958-59.

*Orn*, 495 F.3d at 635.

In evaluating a claimant's testimony, the ALJ may use "ordinary techniques of credibility evaluation." *Smolen*, 80 F.3d at 1284. Such techniques include inconsistencies in the testimony itself or inconsistencies between the claimant's testimony and behavior. *Tommasetti*, 533 F.3d at 1039.

In this case, the ALJ's determination rested on the inconsistencies between Plaintiff's reported daily activities and his claimed degree of disability. An ALJ may properly discredit a claimant's subjective testimony when it is inconsistent with his or her daily activities and other conduct. *Thomas*, 278 F.3d at 958-59; *Verduzco v. Apfel*, 188 F.3d 1087, 1090 (9th Cir. 1999). Although his accounts changed somewhat according to the time at which he gave them, Plaintiff reported the ability to walk a mile or two as cardiac exercise; participate in archery, riflery, and boating; walk up two flights of stairs; lift items weighing fifteen to twenty pounds; drive short distances without problems; and perform standard household chores including sweeping, vacuuming, washing windows, grocery shopping, trimming trees, and general yard and home maintenance. Although Plaintiff experienced pain, he was generally able to forego the use of opiate pain relievers except at bedtime. "[T]he ALJ may discredit a claimant's testimony when the claimant reports participation in everyday activities indicating capacities that are transferable to a work setting." *Molina v. Astrue*, 674 F.3d 1104, 1113 (9th Cir. 2012). "Even where those activities suggest some difficulty functioning, they may be grounds for discrediting the claimant's testimony to the extent that the contradict claims of a totally debilitating impairment." *Id.*

Although Plaintiff's brief does a masterful job of marshalling evidence that supports a conclusion contrary to that reached by the Commissioner, this Court's role is not to substitute its evaluation of the evidence for the ALJ's evaluation. Questions of credibility and resolution of conflicts in the evidence are reserved solely to the Commissioner. *Greger v. Barnhart*, 464 F.3d 968, 972 (9th Cir. 2006). If the ALJ interpreted the claimant's testimony reasonably and his determination is supported by substantial evidence, the Court may not substitute an alternative interpretation. *Rollins v. Massanari*, 261 F.3d 853, 857 (9th Cir. 2001). Substantial evidence and

///

proper legal reasoning supported the ALJ's conclusion that despite Plaintiff's serious impairments, he retained the ability to perform light work.

### D. <u>Outdated Medical Opinions</u>

Plaintiff contends that the ALJ erred in relying on the opinions of Dr. Malik and Dr. Jackson, neither of whom had the opportunity to review the records of medical treatment, evaluation, and testing that occurred between the time that the doctors rendered their opinions and the hearing date. Plaintiff contends that the cardiac stress test[2] and x-rays of Plaintiff's hips, pelvis, and spine, which were produced during the lapse of time between the consultative opinion and the hearing date, rendered the expert opinions untimely. Emphasizing that Plaintiff bore the burden of proving disability, the Commissioner responds that the ALJ appropriately relied on the opinions of the consulting and agency physicians, Drs. Malik and Jackson. The Commissioner adds that ultimately, the Court's only role on review is to determine whether substantial evidence supported the hearing decision.

Both parties confuse two distinct factors in the analysis of an application for disability benefits: (1) the claimant's severe impairments and (2) the claimant's residual functional capacity. The hearing decision found that Plaintiff's severe impairments included bilateral hip arthritis, degenerative disc disease of the cervical and lumbar spine, and coronary artery disease. The x-rays and cardiac stress test appropriately support the ALJ's severe impairment findings but are silent on the question of Plaintiff's residual functional capacity.

The opinions of Drs. Malik and Jackson are the only expert evidence in the record to Plaintiff's residual functional capacity. Plaintiff introduced no evidence of his residual functional capacity other than his own testimony, and as discussed in section C above, that testimony suggested that plaintiff retained greater residual functional capacity than test results, diagnoses, and other medical records alone might indicate. In addition, the ALJ found that Dr. Jackson's residual

///

---

[2] As Dr. Teerlink noted, the results of Plaintiff's stress test were of no value. A treadmill stress test "is considered complete when the patient's heartbeat reaches 85% of it predicted maximum rate. Some patients are unable to exercise up to this point. . . . . If the patient stops before the heartbeat reaches 85% of the predicted maximum rate, the physicians consider the treadmill test incomplete and the results unacceptable." Carolyn A. Kubitschek and Jon C. Dubin, *Social Security Disability—Law and Procedure in Federal Court* § 5.12 at 574-75 (Thompson Reuters 2014).

functional capacity determination was consistent with Plaintiff own testimony regarding his activities of daily living.

The ALJ did not err in relying on the opinions of Drs. Malik and Jackson, and his determination of Plaintiff's residual functional capacity was supported by substantial evidence.

### E. Environmental Limitations

As discussed in the factual statement above, agency consultant Dr. Malik, an examining physician, opined that Plaintiff should not work at heights or around heavy machinery. Dr. Jackson, a non-examining agency physician, rejected Dr. Malik's environmental restrictions, finding that they were not supported by the actual physical findings. The ALJ agreed that the record included no evidence to support the environmental restrictions.

Plaintiff contends that the ALJ's determination must be rejected since the ALJ failed to set forth clear and convincing reasons to reject Dr. Malik's opinion. "Even if contradicted by another doctor, the opinion of an examining physician can be rejected only for specific and legitimate reasons *that are supported by substantial evidence in the record*." *Regennitter v. Comm'r of Social Security Admin.*, 166 F.3d 1294, 1298-99 (9th Cir. 1999) (*emphasis indicates portion of sentence omitted in Plaintiff's brief*). The ALJ in this case provided a specific and legitimate reason for rejecting Dr. Malik's opinion: nothing in the record supported Dr. Malik's opinion that Plaintiff not work at heights or around heavy machinery.

Plaintiff does not point out any such evidence, and despite a careful review of the record as a whole, the Court has been unable to find any evidence supporting Dr. Malik's environmental restrictions opinion. The Court will not disturb the ALJ's determination.

### F. Past Relevant Work

Plaintiff contends that because the ALJ failed to address the physical and mental demands of Plaintiff's past relevant work, he erred in finding that Plaintiff can return to that work. The Commissioner counters that Plaintiff's argument addresses how Plaintiff actually performed his past relevant work but that the ALJ found that Plaintiff could return to his past relevant work as it is generally performed in the national economy. The Court agrees with the Commissioner.

15

The ALJ found that Plaintiff retained "the residual functional capacity to perform the full range of light work as defined in 20 CFR 404.1567(b)." AR 57. He then found that although Plaintiff performed his prior work as a contractor at the medium exertion level and his prior work as a metallurgical technician at a heavy exertion level, both jobs were generally performed at the light level. Plaintiff, said the ALJ, could perform his prior relevant work "as generally performed." AR 62. The vocational expert testified that, as generally performed, both jobs were categorized as light work. The DOT excerpt appended to Plaintiff's brief as Doc. 13-3 confirms that the job of metallurgical technician is categorized as light work.

Plaintiff also appended a DOT excerpt concerning the job of roofer, a job categorized as medium work. Doc. 13-2. The ALJ did not find that Plaintiff could perform his prior relevant work as a roofer, however, he found that Plaintiff could perform his prior relevant work as a contractor.

The ALJ's determination that Plaintiff could perform his prior relevant work as a metallurgical technician or a contractor, as that work is generally performed in the economy, was supported by substantial evidence.

### III. Conclusion and Order

The Court finds that the ALJ applied appropriate legal standards and that substantial evidence supported the ALJ's determination that Plaintiff was not disabled as defined by the ct. Accordingly, the Court hereby DENIES Plaintiff's appeal from the administrative decision of the Commissioner of Social Security. The Clerk of Court is DIRECTED to enter judgment in favor of the Commissioner and against Plaintiff.

IT IS SO ORDERED.

Dated:  **June 27, 2014**                         **/s/ Sandra M. Snyder**
                                              UNITED STATES MAGISTRATE JUDGE